```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
```

| | | |
|---|---|---|
| MARK J. CIAMBRONE, et al., | : | HON. JEROME B. SIMANDLE |
| Plaintiffs, | : | Civil No. 07-3380 (JBS) |
| v. | : | |
| ROBERT SMITH, et al., | : | **OPINION** |
| Defendants. | : | |

APPEARANCES:

Mark W. Rinkus, Esq.
119 East St. Louis Avenue
Wildwood Crest, NJ 08260
      Attorney for Plaintiffs

Thomas B. Reynolds, Esq.
REYNOLDS, DRAKE, WRIGHT & MARCZYK
29 North Shore Road
Absecon, NJ 08201
      Attorney for Defendants Egg Harbor Township, Patrolman
      Robert Smith, Sgt. William Fair and Detective Furlong

**SIMANDLE**, District Judge:

     In September 2002, Plaintiff Mark Ciambrone's then-wife
filed a domestic violence complaint against her husband, and,
owing to concerns over Mr. Ciambrone's threatening comments, a
search warrant was issued authorizing the seizure of Mr.
Ciambrone's firearms.  While executing the warrant, the police
officers discovered that Mr. Ciambrone had in his possession
certain weapons that were illegal to possess under New Jersey
law, and Mr. Ciambrone was arrested and charged with multiple
counts of unlawful weapons possession.  The charges against Mr.

Ciambrone were ultimately dismissed after it was determined that, because Mr. Ciambrone was himself a law enforcement officer, his possession of some (but not all) of the weapons was not illegal.

Mr. Ciambrone and his parents subsequently filed this lawsuit against Egg Harbor Township and three of its law enforcement officers, Robert Smith, William Fair and Detective Furlong (the "Moving Defendants" or "Defendants"),[1] alleging, <u>inter alia</u>, that Mr. Ciambrone had been maliciously prosecuted. Defendants have moved for summary judgment [Docket Item 5]. For the reasons explained herein, the Court will grant Defendants' motion in its entirety.

I.   **BACKGROUND**

   A.   **Facts**

      1.   <u>Domestic Violence Complaint and Search Warrant</u>

The material facts at issue in this matter are not in dispute.[2]  At the time the events underlying Plaintiffs' suit took place, Plaintiff Mark Ciambrone ("Mr. Ciambrone") was a

---

[1]  The Complaint also names Atlantic County and the State of New Jersey as Defendants.  It does not appear that proper service was ever made upon the County or State Defendants.  Plaintiffs' failure to serve Defendants Atlantic County and State of New Jersey within the 120-day period required by Rule 4(m), Fed. R. Civ. P., or at any time since, requires dismissal of all claims against them.

[2]  In the "Statement of Facts" of Plaintiffs' three-page brief in opposition to Defendants' motion, Plaintiffs note that they "adopt the statement of facts as asserted by [D]efendants in their brief."  (Pls.' Opp'n Br. at 1.)

sergeant in the Margate City Police Department. (Compl. ¶ 7.)
On September 25, 2002, Kerry Ciambrone filed a "New Jersey
Domestic Violence Civil Complaint and Temporary Restraining
Order" against her then-husband, Mr. Ciambrone, with the Superior
Court of Atlantic County, Chancery Division, Family Part.
(Defs.' Br. Ex B.)  In her complaint, Ms. Ciambrone alleged that
over the course of the preceding year, she and Mr. Ciambrone had
had marital problems; that Mr. Ciambrone had "had [her]
followed"; that Mr. Ciambrone had sent threatening letters to her
office and made threats regarding Mrs. Ciambrone's friends and
children; that Mr. Ciambrone had "warned [her] that if it wasn't
for [their] kids, [he] would have killed [her] last night"; and
that Mr. Ciambrone had illegally taped her telephone
conversations. (Id.)

The Superior Court Judge[3] issued a Temporary Restraining
Order ("TRO"), which included a warrant to search for and seize
all weapons possessed by Mr. Ciambrone from both the family home
in Egg Harbor Township, as well as from Mr. Ciambrone's parents'
home in Northfield. (Id.)  Defendants Patrolman Robert Smith and
Sergeant William Fair, along with two other Egg Harbor Township
police officers not named as Defendants herein, were subsequently
dispatched to Mr. Ciambrone's residence to serve the TRO upon Mr.

_____

    [3]  The Judge's signature on the TRO is illegible. (Defs.'
Br. Ex B.)

3

Ciambrone and to seize the weapons specified in the warrant. (Defs.' Br. Ex C at 2.)  Mr. Ciambrone was not present when the officers arrived.  (Id.)

The officers contacted Kerry Ciambrone by telephone, who informed them that Mr. Ciambrone kept most of his weapons in the garage.  (Id.)  The officers obtained the code to the garage door from Ms. Ciambrone, but upon entering the garage, the officers found only empty rifle and bow cases and two compound bows. (Id.)  There was a small locked room within the garage where it was believed other weapons were stored.  (Id.)  Before the officers opened the door to the small room, two of Mr. Ciambrone's colleagues from the Margate Police Department, Captain Fritz and Detective Oakes, arrived at the Ciambrone residence and informed the Egg Harbor officers that Mr. Ciambrone was on his way.  (Id.)

Mr. Ciambrone arrived twenty minutes later.  (Id.) Defendant Fair presented Mr. Ciambrone with the TRO and search warrant, and asked him for the key to the locked room, to which Mr. Ciambrone responded, "you can have the key but there aren't any guns in [there]."  (Id.)  Mr. Ciambrone then told Defendant Fair he gave his firearms away.  (Id.)  After speaking with his Margate colleague, Captain Fritz, however, Mr. Ciambrone admitted that he did possess firearms, but that he had taken them to his parents' home in Northfield.  (Id.)

4

Defendant Smith then opened the locked gun room and found various empty holsters, boxes of assorted caliber ammunition, black powder and other components for making ammunition, and various hunting knives.  (Id.)  In a small closet within the gun room, Defendant Smith found a loaded, .22 caliber pistol with what appeared to be a homemade firearm silencer fashioned from a two-liter plastic soda bottle and duct tape.  The officers, recognizing that New Jersey law prohibits the possession of a firearm silencer,[4] arrested Mr. Ciambrone for possession of an illegal weapon.  (Id.)  Officer Goodman then transported Mr. Ciambrone to the Egg Harbor Township police headquarters.  (Id.) The remaining officers subsequently retrieved Mr. Ciambrone's "duty weapon" from the den of the Ciambrone residence and, as was directed by the search warrant, proceeded to Mr. Ciambrone's parents' residence in Northfield.  (Id. at 3.)

Mr. Ciambrone's mother, Lorraine Ciambrone, arrived at the Northfield residence as the police officers were entering her home, and she spoke with Captain Fritz of the Margate Police. (Id.)  In a rear bedroom of the Northfield residence, the officers found a pile of various rifles, shotguns, handguns, and ammunition, which were later identified as Mark Ciambrone's weapons.  (Id.)  Among these weapons were five thirty-round

---

[4]  Under N.J.S.A. 2C:39-3, "[a]ny person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree."

magazines loaded with .223 caliber ammunition, four twenty-round magazines, and two thirty-round magazines containing .223 caliber ammunition. (Id.) Additional weapons were found in the hall closet, including two rifles: a Colt AR-15 .223 caliber Model SP1, and a Heckler and Koch .223 caliber Model 93. (Id.)

Mr. Ciambrone's father, Frank Ciambrone, then arrived at the residence. (Id.) Frank Ciambrone stated that the two assault rifles in the closet belonged to his son, and that he had not known that they were in his closet. (Id.) Frank Ciambrone then escorted the officers to his own gun room to seize his weapons as directed by the warrant. (Id.) The officers removed various knives, handguns, rifles, shotguns, ammunition, compound bows, and arrows from the gun room. (Id.) Defendant Smith transported all of the seized weapons to police headquarters and logged them into evidence. (Id.) The Egg Harbor Township Police Department catalogued over ninety separate weapons seized from the residences of Mark Ciambrone and his parents. (Defs.' Br. Ex. E.)

2.   Interview with Mark Ciambrone

Detective John Furlong of the Egg Harbor Township Police Department interviewed Mr. Ciambrone at the police headquarters at approximately 6:22 p.m. on the day of Mr. Ciambrone's arrest.[5]

_____

[5] Detective Furlong read Mr. Ciambrone his Miranda warnings and requested, and received, permission from Mr. Ciambrone to tape record the interview. (Defs.' Br. Ex. D at 1.)

(Defs.' Br. Ex. D at 1.)  Mr. Ciambrone asked Defendant Furlong what charges would be brought against him, and Defendant Furlong replied that he knew few specifics, but had been told that prohibited weapons were recovered from Frank Ciambrone's home, and that Mr. Ciambrone or his father would be charged when ownership was established.  (Id.)

During the interview, Mr. Ciambrone admitted that the two assault rifles, the Colt AR-15 and Heckler and Koch 93, belonged to him, but had been stored at his father Frank Ciambrone's home since late 1988 or 1989.  (Id. at 2.)  He stated that he purchased the assault rifles about a year prior to the enactment of the assault weapons ban and that he intended to give the rifles to his cousin who lived in Texas.  (Id.)  He further stated that he had taken his gun collection to his father's home about one month earlier because there was an "ongoing domestic situation in his own home and he wanted to avoid any problems associated with his guns."  (Id.)

Defendant Furlong asked Mr. Ciambrone if any of his weapons had been altered, which Mr. Ciambrone denied.  (Id.)  Defendant Furlong then asked if any weapon had a silencer attached, and Mr. Ciambrone admitted that he had attached a plastic bottle to his .22 caliber pistol to suppress the noise, because he would practice firing his gun in the rear of his residence and the noise bothered his neighbor's dog.  (Id.)

7

### 3.   Criminal Charges Filed and Dismissed

On September 25, 2002, the day of his arrest, Mark Ciambrone was charged with possession of a gravity knife or switchblade in violation of N.J.S.A. 2C:39-3e,[6] possession of assault firearms in violation of N.J.S.A. 2C:39-5f,[7] possession of large-capacity ammunition magazines in violation of N.J.S.A. 2C:39-3j,[8] and possession of a silencer in violation of N.J.S.A. 2C:39-3c.[9] (Defs.' Br. Exs. F and G.)  In accordance with New Jersey Court Rules, these charges were initiated through the filing of

---

[6]  N.J.S.A. 2C:39-3e provides in pertinent part that "[a]ny person who knowingly has in his possession any gravity knife [or] switchblade knife . . . without any explainable lawful purpose, is guilty of a crime of the fourth degree."

[7]  N.J.S.A. 2C:39-5f provides in pertinent part that "[a]ny person who knowingly has in his possession an assault firearm is guilty of a crime of the third degree except if the assault firearm is licensed pursuant to N.J.S.A. 2C:58-5; registered pursuant to section 11 of P.L. 1990, c. 32 (C.2C:58-12) or rendered inoperable pursuant to section 12 of P.L. 1990, c. 32(C.2C:58:13)."

[8]  N.J.S.A. 2C:39-3j provides, in pertinent part, "[a]ny person who knowingly has in his possession a large capacity ammunition magazine is guilty of a crime of the fourth degree unless the person has registered an assault firearm pursuant to section 11 of P.L. 1990, c. 32 (C.2C:58-12) and the magazine is used in connection with participation in competitive shooting matches sanctioned by the Director of Civilian Marksmanship of the United States Department of the Army."  N.J. Stat. Ann. § 2C:39-3j.

[9]  N.J.S.A. 2C:39-3c provides in pertinent part that "[a]ny person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree."

criminal complaints[10] before a judge, who signed the complaints and issued a warrant for Mr. Ciambrone's arrest upon a finding of probable cause.  (Id.)  The judge set bail at $20,000.00, and Mr. Ciambrone was released on his own recognizance.  (Id.)  Mr. Ciambrone was indicted on these charges in Atlantic County, New Jersey on February 13, 2003.[11]  (Defs. Br. Ex. K.)

On March 1, 2004, the Attorney General of New Jersey directed the Atlantic County Prosecutor's Office ("Prosecutor") to dismiss the count for unlawful possession of assault firearms in violation of N.J.S.A. 2C:39-5f.  (Id.)  In a statement issued on March 19, 2004, the Attorney General explained that his request to dismiss those counts was based "in part because of conflicting or ambiguous legal advice that may have been given by representatives from the Department of Law and Public Safety over the past several years following the enactment of the assault firearms law."  (Id.)  While the March 1, 2004 order only addressed Mr. Ciambrone's alleged violation of N.J.S.A. 2C:39-5f – the criminal statute prohibiting the possession of assault firearms – on April 20, 2004, the Prosecutor dismissed the remaining counts of the indictment as "an exercise of

---

[10]  For reasons that are not apparent from the record, the charges against Mr. Ciambrone were filed on two separate criminal complaints – one that charged him with unlawful possession of a firearm silencer, and a separate complaint containing the additional charges.  (Defs.' Br. Exs. F and G.)

[11]  No copy of the indictment was submitted by either party.

9

prosecutorial discretion."  (Id.)

**B.   Procedural History**

Exactly two years after the indictment against Mr. Ciambrone was dismissed, on April 20, 2006, Plaintiffs Mark, Frank, and Lorraine Ciambrone filed this Complaint in the Superior Court of New Jersey against Patrolman Robert Smith, Sergeant William Fair, Detective John Furlong, Egg Harbor Township, Atlantic County, and the State of New Jersey.[12]  The Complaint alleges: that Defendants unlawfully arrested Mr. Ciambrone in violation of the Fourth and Fourteenth Amendments (Count 5); that Defendants maliciously prosecuted Mr. Ciambrone in violation of both the United States Constitution (Count 1) and New Jersey common law (Count 3); that Defendants unlawfully searched the home of Mr. Ciambrone's parents in violation of Frank and Lorraine Ciambrones' Fourth and Fourteenth Amendment rights (Count 2); and that Defendants invaded Frank and Lorraine Ciambrones' privacy and converted their property in violation of New Jersey law (Count 4).

On November 3, 2006, after Plaintiffs failed to timely serve the summons and Complaint, the case was dismissed for lack of prosecution.  (Docket Item 1 Ex. A at 1.)  On March 2, 2007, the

_____

[12]  As the Court noted, supra, it does not appear that proper service was ever made upon the County or State Defendants. The Complaint also named "John Does 1-5" as fictitiously named defendants who have not, to date, been identified.

10

Superior Court granted Plaintiffs' motion to reinstate the Complaint "without prejudice to the assertion of any defenses, including without limitation, the operation of the statute of limitations." (Id. at 3.)  After further delay by Plaintiffs in serving the Complaint, the matter was once again scheduled to be dismissed for lack of prosecution on July 6, 2007.  (Id.) Plaintiff filed a motion for an extension of time on June 26, 2007, and the summonses were served on June 27, 2007.  (Docket Item 1 Ex. D.)  Defendants timely removed the case to this Court on July 20, 2007 and subsequently filed the motion for summary judgment presently under consideration.

## II. DISCUSSION

Defendants have moved for summary judgment on various grounds, arguing: (1) that Plaintiffs' federal claims are barred by the applicable statutes of limitations, (2) that Plaintiffs' tort claims must be dismissed for failure to file a Notice of Tort Claim, (3) that Plaintiffs have failed to adduce facts sufficient to raise a jury question as to Egg Harbor Township's municipal liability, and (4) that the individual Defendants are entitled to qualified immunity.[13]  The Court addresses the legal standard under which Defendants' motion is reviewed and the

---

[13]  Because the Court agrees with Defendants that they are entitled to summary judgment under the four grounds summarized above, it does not address the remainder of arguments Defendants advance in support of their motion.

merits of the parties' arguments in turn below.

**A.    Standard of Review**

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable inferences from the evidence, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary

judgment, 'if appropriate,' will be entered." <u>United States v.</u>
<u>Premises Known as 717 South Woodward Street, Allentown, Pa.</u>, 2
F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e))
(citations omitted).  As the Supreme Court has explained,

> Rule 56(c) mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish
> the existence of an element essential to that party's
> case, and on which that party will bear the burden of
> proof at trial.  In such a situation, there can be no
> genuine issue as to any material fact, since a complete
> failure of proof concerning an essential element of the
> nonmoving party's case necessarily renders all other
> facts immaterial.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986) (internal
quotations and citations omitted).

   **B.   Timeliness of Plaintiffs' Federal Claims**

   Defendants argue, and the Court agrees, that with the
exception of Mr. Ciambrone's malicious prosecution claim,
Plaintiffs' federal claims are barred by the applicable statutes
of limitations.  "Limitations periods in § 1983 suits are to be
determined by reference to the appropriate state statute of
limitations and the coordinate tolling rules." <u>Hardin v. Straub</u>,
490 U.S. 536, 539 (1989) (internal quotations and citations
omitted).  In New Jersey, section 1983 claims are governed by the
statute of limitations for personal injury claims, <u>Cito v.</u>
<u>Bridgewater Twp. Police Dept.</u>, 892 F.2d 23, 25 (3d Cir. 1989),
which requires that such actions be "commenced within two years .
. . after the cause of any such action . . . [has] accrued."

13

N.J.S.A. 2A:14-2.  A claim brought pursuant to section 1983 "accrues when the plaintiff knew or should have known of the injury upon which its action is based."  Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998).

While Mr. Ciambrone's federal malicious prosecution claim did not accrue until April 20, 2004, when the charges against him were dismissed, see Smith v. Holtz, 87 F.3d 108, 110 (3d Cir. 1996), the statute of limitations for Plaintiffs' false arrest and unlawful search claims began to run on September 25, 2002, when the allegedly unlawful arrest and searches took place.  See Sameric, 142 F.3d at 599; see also Montgomery v. De Simone, 159 F.3d 120, 126 n.5 (3d Cir. 1998) (recognizing that, unlike malicious prosecution claims, "false arrest . . . claims accrue[] [at the time of the plaintiff's] arrest").  The statute of limitations for these claims thus expired on September 25, 2004, see N.J.S.A. 2A:14-2, well over a year before the Complaint in this action was filed.  The Court thus finds that, with the exception of Mr. Ciambrone's malicious prosecution claim, all of Plaintiffs' federal claims are time-barred.  Defendants' motion for summary judgment as to these claims will accordingly be granted.

**C.   Failure to File Notice of Tort Claims**

The Court likewise agrees with Defendants that Plaintiffs'

14

tort claims arising under New Jersey law must be dismissed on
account of Plaintiffs' failure to satisfy the notice of claim
requirements under the New Jersey Tort Claims Act ("NJTCA"),
N.J.S.A. 59:1-1 to 12-3.  Under the NJTCA,

> [p]rior to filing a complaint, a plaintiff must submit a
> notice of claim to the public entity within ninety days
> of the claim's accrual, N.J.S.A. 59:8-8a, and must file
> suit within two years after the claim's accrual, N.J.S.A.
> 59:8-8b. The notice must include the name of the public
> entity, and the name of the employee or employees causing
> the injury, if known.  N.J.S.A. 59:8-4e.

Velez v. City of Jersey City, 180 N.J. 284, 290 (2004).  The
NJTCA makes clear the consequences that result from a plaintiff's
failure to comply with its notice requirements: such a claimant
"shall be forever barred from recovering against a public entity
or public employee."[14]  N.J.S.A. 59:8-8.  It is undisputed that
in this case, Plaintiffs failed to file a notice of tort claims,
and that well over ninety days have passed since all of
Plaintiffs' tort claims accrued.  Accordingly, the Court agrees

---

[14]  Under the NJTCA, a plaintiff who fails to submit a
notice of claim to the public entity within ninety days of the
claim's accrual may request permission to file a notice of late
claim under N.J.S.A. 59:8-9.  Under that provision,

> Application to the court for permission to file a late
> notice of claim shall be made upon motion supported by
> affidavits based upon personal knowledge of the affiant
> showing sufficient reasons constituting extraordinary
> circumstances for his failure to file notice of claim
> within the period of time prescribed by section 59:8-8 of
> this act or to file a motion seeking leave to file a late
> notice of claim within a reasonable time thereafter.

N.J.S.A. 59:8-9.  No such application was ever made in this case.

with Defendants that these claims are unsustainable, and will grant Defendants' motion for summary judgment as to all of Plaintiffs' state law tort claims.

### D.  Municipal Liability

As the preceding sections make clear, the only claim in this case that is not barred by the statute of limitations or the NJTCA is Mr. Ciambrone's section 1983 malicious prosecution claim (Count I), which he asserts against all Defendants.  As Defendants note, under Monell v. New York City, 436 U.S. 658, 691 (1978), and its progeny, Mr. Ciambrone's claim against Egg Harbor Township cannot survive summary judgment unless Mr. Ciambrone demonstrates that the Township itself caused the alleged violation.  See, e.g., Board of the County Commissioners of Bryan County v. Brown, 520 U.S. 397, 404 (1997).  That is, in order to prevail on such a claim, Mr. Ciambrone would have to adduce evidence demonstrating "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation such that the municipality was the moving force behind the constitutional deprivation alleged." Camiolo v. State Farm Fire and Cas. Co., 334 F.3d 345, 363 n.13 (3d Cir. 2003) (internal quotations and citations omitted).  Mr. Ciambrone has submitted no evidence whatsoever, much less evidence that the Township employed such a policy or custom.  Summary judgment as to Mr. Ciambrone's malicious prosecution claim against Egg Harbor

Township will thus be granted.

> **E.    Qualified Immunity**

The Individual Defendants argue that they are entitled to qualified immunity from Mr. Ciambrone's malicious prosecution claim.  As the Court explains below, it agrees with Defendants that the officers named in the Complaint are entitled to qualified immunity and will grant their motion for summary judgment as to Plaintiff's remaining claim.

> 1.    Qualified Immunity Standard

As an "accommodation of competing values," qualified immunity strikes a balance by permitting a plaintiff to recover for constitutional violations where the defendant officer was "plainly incompetent or . . . knowingly violate[d] the law," while immunizing an officer who "made a reasonable mistake about the legal constraints on his actions."  Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted).  In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court described the two-step inquiry courts undertake in determining whether a governmental officer is entitled to qualified immunity.  First, the Court must address whether "the officer's conduct violated a constitutional right."  Id. at 201. As the Court of Appeals noted in Curley, the first step of the analysis is "not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be

addressed in an analysis of immunity." Curley, 499 F.3d at 207.
If in this first step the Court finds that there was no
constitutional violation, "there is no necessity for further
inquiries concerning qualified immunity." Saucier, 533 U.S. at
201.

"If, and only if, the court finds a violation of a
constitutional right, the court moves to the second step of the
analysis and asks whether immunity should nevertheless shield the
officer from liability." Curley, 499 F.3d at 207 (quoting Scott
v. Harris, --- U.S. ----, 127 S. Ct. 1769, 1774 (2007)). In the
second step of the analysis, the Court addresses "whether the
right that was violated was clearly established, or,
in other words, 'whether it would be clear to a reasonable
officer that his conduct was unlawful in the situation he
confronted.'" Id. (quoting Saucier, 533 U.S. at 202). Where, as
here, the reasonableness of the officer's conduct turns on
whether or not he had probable cause to arrest or initiate
criminal proceedings against a defendant, "a police officer is
entitled to qualified immunity unless it would have been clear to
a reasonable officer there was no probable cause to arrest."
Gilles v. Davis, 427 F.3d 197, 205 (3d Cir. 2005). Put
differently, "whether there was any reasonable basis to suppose
there was probable cause . . . is the test for qualified
immunity." Id. (quoting Kijonka v. Seitzinger, 363 F.3d 645, 648

(7th Cir. 2004)) (emphasis added).

      2.  <u>Analysis</u>

      The Court harbors serious doubts about Mr. Ciambrone's ability to prove that the officers' conduct violated his constitutional right to be free from malicious prosecution under the first step of the qualified immunity analysis.

> To prove malicious prosecution under section 1983 when the claim is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

<u>Johnson v. Knorr</u>, 477 F.3d 75, 81-82 (3d Cir. 2007).  "The existence of probable cause . . . is an absolute defense to Plaintiff's . . . malicious prosecution claim[]."  <u>Pomykacz v. Borough of West Wildwood</u>, 438 F. Supp. 2d 504, 510 n.8 (D.N.J. 2006) (citations omitted).  In other words, if the officers had probable cause to believe that Mr. Ciambrone committed the offenses with which he was charged, then they did not violate his right to be free from malicious prosecution.

      As the Court of Appeals has explained, "[p]robable cause means facts and circumstances that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  <u>Camiolo</u>, 334 F.3d

19

at 363 (internal quotations and citations omitted).  In other words, "[s]o long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists."  United States v. Mounts, 248 F.3d 712, 715 (7th Cir. 2001) (citation omitted).

At the time of Mr. Ciambrone's arrest, and later that same day when criminal charges against him were filed, the Individual Defendants inarguably had probable cause to believe that Mr. Ciambrone had committed three of the four offenses with which he was charged.  See Johnson, 477 F.3d at 85 ("a cause of action for malicious prosecution may be based on the prosecution of more than one charge, and the validity of the prosecution for each charge comes into question").  Indeed, Mr. Ciambrone does not appear to deny that at the time the police officers searched his and his parents' home for firearms, he knowingly possessed a homemade firearm silencer, a gravity knife, and large-capacity ammunition magazines, and that his possession of these weapons was unlawful under N.J.S.A. 2C:39-3.[15]  Based on the weapons

---

[15]   That Mr. Ciambrone was a sergeant with the Margate City Police Department does not make his possession of these particular weapons legal.  While N.J.S.A. 2C:39-3 contains an exception for "any law enforcement officer while actually on duty or traveling to or from an authorized place of duty, provided that his possession of the prohibited weapon or device has been duly authorized under the applicable . . . law enforcement orders," N.J.S.A. 2C:39-3g, Mr. Ciambrone was neither on duty nor traveling to an authorized place of duty when he was arrested for

uncovered during the officers' search, and Mr. Ciambrone's admission that the weapons in question were his, the officers manifestly had probable cause to arrest and charge Mr. Ciambrone with violations of N.J.S.A. 2C:39-3c, 2C:39-3e, and 2C:39-3j; Mr. Ciambrone's admission of ownership created more than "a fair probability" that he violated the statutes in question, Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (internal quotations and citations omitted), which criminalize knowing possession of the very weapons discovered.

Mr. Ciambrone argues, however, that the Individual Defendants lacked probable cause to charge him with violating N.J.S.A. 2C:39-5f, which prohibits the knowing possession of assault firearms.  He does not deny that he informed Defendant Furlong that the two assault firearms the officers discovered belonged to him, (Defs.' Br. Ex. D at 2), or that N.J.S.A. 2C:39-5f criminalizes the knowing possession of such weapons.  Mr. Ciambrone's argument as to why the Individual Defendants lacked probable cause to charge him with violating N.J.S.A. 2C:58-5f rests instead upon his claim that, because he was a law enforcement officer, his ownership of the assault firearms was not unlawful.  See N.J.S.A. 2C:39-6a(7)(a).

Mr. Ciambrone is correct that New Jersey law contains an exemption to the assault firearms ban for a "regularly employed

possessing the weapons in question.

member . . . of the police department of any . . . municipality"
who "has satisfactorily completed a firearms training course
approved by the Police Training Commission" and who "annually
qualif[ies] in the use of a revolver or similar weapon."
N.J.S.A. 2C:39-6a(7)(a), 2C:39-6j.  However, while an officer who
"conclusively know[s] that an investigative target's behavior is
protected by a legally cognizable affirmative defense . . . lacks
a legal foundation to arrest that person for that behavior,"
officers are not "required to conduct a trial-like inquiry as a
precondition to executing a valid arrest."  Painter v. Robertson,
185 F.3d 557, 571 n.21 (6th Cir. 1999) (citing Linn v. Garcia,
531 F.2d 855, 861 (8th Cir. 1976)) (emphasis added).  In the
absence of conclusive knowledge that a valid affirmative defense
excuses a suspect's conduct, "the merits of an alleged
affirmative defense should be assessed by prosecutors and judges,
not policemen."  Id. (also noting that "law enforcement
operatives [are not required to] conduct quasi-trials as a
necessary predicate to the warrantless arrest of perpetrators in
every situation wherein the subject asserts a purported legal
excuse for his actions"); see also Hodgkins ex rel. Hodgkins v.
Peterson, 355 F.3d 1048, 1061 (7th Cir. 2004) (noting that the
"validity of [an] affirmative defense is irrelevant to whether or
not [a] police officer sued for false arrest had probable cause
to make [the] arrest" and that "[o]nce a police officer discovers

22

sufficient facts to establish probable cause, she has no constitutional obligation to conduct any further investigation in the hope of discovering exculpatory evidence").

In this case, while the record indicates that the Individual Defendants knew that Mr. Ciambrone was a "regularly employed member . . . of the [Margate City] [P]olice [D]epartment," N.J.S.A. 2C:39-6a(7)(a), nothing in the record suggests that the officers conclusively knew that Mr. Ciambrone had also "satisfactorily completed a firearms training course approved by the Police Training Commission" and "annually qualif[ied]" in the use of the weapons in question, N.J.S.A. 2C:39-6j, which are necessary predicates for the applicability of the exemption upon which Mr. Ciambrone relies.  Given the evidence available to the officers demonstrating that Mr. Ciambrone was, at the time, in violation of numerous other provisions of New Jersey law prohibiting the possession of particular weapons (e.g., firearms silencers, gravity knives, and large capacity ammunition magazines), the suggestion implicit in Mr. Ciambrone's argument that the officers should have presumed that Mr. Ciambrone had complied with section 2C:39-6j's training and annual qualification requirements, and that they therefore lacked probable cause to believe that Mr. Ciambrone had also violated N.J.S.A. 2C:39-5f, strikes the Court as untenable.

Nonetheless, because the question of "probable cause in a section 1983 damage suit is one for the jury," Montgomery, 159 F.3d at 124, the Court will assume for present purposes that "the [Defendants'] conduct violated a constitutional right," Saucier, 533 U.S. at 201, and proceed to the second step of the qualified immunity analysis. See Curley, 499 F.3d at 211 (in the second step of the analysis, "whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury"). As the Court explained, supra, under the second step of the analysis, "a police officer is entitled to qualified immunity unless it would have been clear to a reasonable officer [that] there was no probable cause to arrest." Gilles, 427 F.3d at 205 (emphasis added) (noting as well that an officer is entitled to qualified immunity if he had "any reasonable basis to suppose there was probable cause").

Under this standard, the Court has no difficulty finding that the Individual Defendants are entitled to qualified immunity. The evidence available to the officers indicated that Mr. Ciambrone possessed firearms subject to N.J.S.A. 2C:58-5f, and while Defendants knew that Mr. Ciambrone was a law enforcement officer, nothing in the record suggests that they knew "conclusively," Painter, 185 F.3d at 571 n.21, that Mr. Ciambrone had complied with N.J.S.A. 2C:39-6j's training and

annual qualification requirements; indeed, as the Court noted, supra, in light of Mr. Ciambrone's possession of other illegal weapons, the officers at minimum had a reasonable basis to doubt whether Mr. Ciambrone qualified for N.J.S.A. 2C:39-6a(7)(a)'s exemption.  See Hodgkins, 355 F.3d at 1061; Linn, 531 F.2d at 861.  Given the abundance of previously cited cases holding that "the merits of an alleged affirmative defense should be assessed by prosecutors and judges, not policemen," Painter, 185 F.3d at 571 n.21, the Court certainly cannot conclude that "it would have been clear to a reasonable officer [that] there was no probable cause" to charge Mr. Ciambrone under N.J.S.A. 2C:39-5f.  Gilles, 427 F.3d at 205.

Bearing in mind that qualified immunity "is broad in scope and protects all but the plainly incompetent or those who knowingly violate the law," Curley, 499 F.3d 206 (internal quotations and citations omitted), the Court finds that the Individual Defendants' conduct easily falls well within the zone of conduct protected by qualified immunity.  The Court will accordingly grant the Individual Defendants' motion for summary judgment as to Mr. Ciambrone's malicious prosecution claim.

## III. CONCLUSION

For the reasons explained above, the Court will grant

Defendants' motion for summary judgment in its entirety.  The accompanying Order will be entered.[16]

**September 19, 2008**              **s/ Jerome B. Simandle**
Date                                JEROME B. SIMANDLE
                                    United States District Judge

---

[16] As the Court recognized in Note 1, supra, Plaintiffs named Atlantic County and the State of New Jersey as Defendants, but never effected proper service upon either Defendant.  Since the County and State were never made parties to this action, the instant Opinion addresses and disposes of all of Plaintiffs' claims.